UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION AT LAFAYETTE

MICHELLE A. HENRICKS,                )
                                     )
            Plaintiff,               )
                                     )
      v.                             )        No. 4:10 CV 42
                                     )
WHITE COUNTY,                        )
                                     )
            Defendant.               )

<u>OPINION and ORDER</u>

I.     BACKGROUND

       Plaintiff began working for defendant White County in April of 2007 as a

secretary for the Area Plan office. (DE # 19-1 at 4, Pl.'s Dep. 11:1-7.) The staff of the Area

Plan also included Diann Weaver, the Area Plan Director, and Melanie Harl, Weaver's

second-in-command. (*Id.* at 4, Pl.'s Dep. 11:21-12:19.) Jerry Altman served as counsel for

the Area Plan. (*Id.* at 5, Pl.'s Dep. 14:20-21.)

       Plaintiff was uncomfortable with the attention Altman paid to her. Plaintiff

alleges that beginning in May of 2008, Altman would touch her shoulder, touch her

clothing and comment on it being silky or soft, stare at her breasts, eye her up and

down, speak in a "creepy, soft whisper-ish kind of tone," and lick his teeth and lips in a

"flirtatious manner." (*Id.* at 7, Pl.'s Dep. 19:14 - 23:14; DE # 27-1 ¶ 8.) Altman would also

shut the door to his office when it was not necessary, or come around behind her desk

rather than speaking to her over the counter. (DE # 19-1 at 6-7, Pl.'s Dep. 19:12-13, 21:24-

25.) Plaintiff alleges that she complained about Altman's conduct to Weaver at least five

times before July of 2008. (DE # 27-1 ¶ 8.) Plaintiff claims that Weaver responded that Altman was a pervert. (*Id.*)

On July 22, 2008, plaintiff went into Altman's office to drop off papers and discuss an upcoming deposition. (DE # 19-1 at 8, Pl.'s Dep. 25:1-5.) Altman closed his door and then sat behind his desk. (*Id.*, Pl.'s Dep. 27:14-28:7.) At some point, Altman got up and went over to sit in a recliner in the corner of the office. (*Id.*, Pl.'s Dep. 28:8-25.) Altman sat in a chair "with his legs open" while "moving his hand in a rubbing pattern." (*Id.* at 9, Pl.'s Dep. 29:9-17.) According to plaintiff, "[i]t appeared he had an erection," though she could not tell for sure because she was trying to look away. (*Id.*, Pl.'s Dep. 29:24, 32:1-3.)

After the incident, plaintiff made a comment to Harl about Altman's behavior, and Harl appeared disgusted. (*Id.*, Pl.'s Dep. 32:10-12.) Then plaintiff told Weaver what happened. According to plaintiff, Weaver "kind of laughed" and said "'okay' or 'uh-huh.'" (*Id.*, Pl.'s Dep. 32:22-24.) Plaintiff then informed Weaver that she did not feel comfortable being around Altman anymore and asked not to be sent to his office in the future. (*Id.* at 9-10, Pl.'s Dep. 32:25-33:12.) According to plaintiff, Weaver responded that plaintiff had a job to do and that if things needed to be taken there, they needed to be taken there. (*Id.* at 10, Pl.'s Dep. 33:5-7.) Plaintiff did not go back to Altman's office and was never around him again. (*Id.*, Pl.'s Dep. 33:7-12.)

On July 25, 2008, plaintiff informed Weaver that she was pregnant. (*Id.*, Pl.'s Dep. 33:13-17.) According to plaintiff, Weaver was upset and responded in an angry tone of

voice that she "wasn't sure how she would man the office during my absence." (*Id.*, Pl.'s Dep. 33:19-25.)

Generally, plaintiff got along with Weaver and Harl. (*Id.* at 5, Pl.'s Dep. 14:8-16.) But plaintiff claims that after the incident with Altman and the announcement of her pregnancy, things began to change. On August 25, 2008, Weaver informed plaintiff that plaintiff improperly contacted other communities regarding the adoption of ordinances. (Pl.'s Aff. ¶ 7.) Plaintiff was surprised by this criticism, because she believed it to be common practice to contact communities to do research and to borrow from their experience when conducting the Area Plan's business. (*Id.*) Plaintiff claims that she made similar calls prior to July of 2008 and that she thought Weaver was aware of that. (*Id.*)

Plaintiff claims that things went downhill fast after August 25. (DE # 19-1 at 11, Pl.'s Dep. 39:22-25.) The Area Plan "wasn't as friendly and pleasant of a work environment." (*Id.* at 10, Pl.'s Dep. at 35:18-22.) Plaintiff claims that she was subjected to slamming doors and yelling. (*Id.* at 15, Pl.'s Dep. 54:3.) Further, Weaver and Harl would ignore plaintiff, sometimes for days. (DE # 27-1 ¶ 13.)

On August 27, plaintiff requested an "executive session" (a private, formal meeting to resolve the issue) with the Area Plan's Board of Commissioners. (DE # 19-1 at 11, Pl.'s Dep. at 40:8-15.) That same day, Weaver presented plaintiff with a "Disciplinary Warning Notice," informing her that it was inappropriate to discuss internal business affairs in front of customers and that she needed to be polite to

customers no matter what was going on within the office. (DE # 19-3.) According to Weaver's summary of her meeting with plaintiff regarding the notice, plaintiff told Weaver that plaintiff had escalated things by requesting an executive session and that Weaver would not be part of the session. (*Id.*) Plaintiff refused to sign the disciplinary notice because she felt it was unfair. (*Id.*; DE # 19-1 at 12, Pl.'s Dep. 42:1-8.)

Later that day, plaintiff submitted a written grievance to Weaver regarding the warning and Weaver's hostility in the workplace. (DE # 19-1 at 12, Pl.'s Dep. 43:6-44:2; DE # 19-4.) Plaintiff also delivered the grievance to the White County Commissioners' secretary. (*Id.*, Pl.'s Dep. 44:16-21.) The County Commissioners called plaintiff on September 8 and told her that she needed to address the issue through the Area Plan Commission. (*Id.* at 12-13, Pl.'s Dep. 44:22-45:23.) On September 15, 2008, the County Commissioners issued a written response to plaintiff, informing her that they had decided to take no further action regarding her grievance. (DE # 19-5.)

On September 19, 2008, Weaver presented plaintiff with another "Disciplinary Warning Notice." (DE # 19-6.) This time, Weaver warned plaintiff about causing disturbances in the office on several occasions and for saying inappropriate things to another employee loudly enough to be heard by the public. (*Id.*) Plaintiff did not sign this notice either. (*Id.*)

On the morning of September 23, 2008, plaintiff presented Weaver with a letter, which stated:

> It is with reluctance that I'm submitting this letter. For quite a while now I
> have become less and less satisfied with the work environment situation in

4

the Area Plan office. The direction of the company, the group in which I work, and the new targets and the methods of accomplishing them are making it increasingly difficult for the department to function in a proper manner. Indiana Codes, The White County Zoning Ordinance, and multiple other County Policies are being violated. I have requested multiple meetings with you to try to resolve these problems to which you have denied all requests. I have informed you of a Sexual Harassment claim against Attorney Altman to which you have not acted on in any way except retaliation. I have been falsely written up and harassed by co-workers including yourself. You have also asked me to break the law during a recent deposition to which I did not do and this too has caused problems within the office. This work environment is neither healthy nor legal and therefore I do not feel safe remaining within this office.

Therefore, it is with regret that I ask you to accept this letter and do whatever you feel is necessary. I can not safely remain within the office without changes being made. I ask that you put me on administrative leave with pay until a meeting can be held to determine the proper handling of the office and the running procedures. Again, for my personal safety I do not feel safe remaining in this office.

If you deny my request then I am forced to ask you to accept this as my resignation from White County Area Plan effective Tuesday September 23, 2008 at Noon.

(DE # 19-7.) Plaintiff turned in her key to the office as she left for the day because she "didn't know where things went from there." (DE # 19-1 at 15, Pl.'s Dep. 55:13-56:6.) On September 24, 2008, plaintiff called the office to see if she had been placed on administrative leave, but was informed by Weaver that her resignation had been accepted. (DE # 27-1 ¶ 5.) Plaintiff filed a charge with the Equal Employment Opportunity Commission ("E.E.O.C.") on October 23, 2008, claiming sex discrimination and retaliation. (DE # 24-2.) White County received a copy of the charge on November 3, 2008. (*Id.*)

Later in 2008, plaintiff learned that Weaver was not going to be reappointed to her position as director of the Area Plan. (DE # 19-1 at 16, Pl.'s Dep. 57:12-19.) Plaintiff submitted her resume for consideration for the director's position, which was received on December 19, 2008. (DE # 19-9.) Around the same time, plaintiff also applied for a secretarial position at the Area Plan. (DE # 19-1 at 18, Pl.'s Dep. 67:14-68:8.) Plaintiff discussed her potential re-employment over the phone with Gerald Cartmell, an Area Plan Commissioner, who told her that she would not be considered for re-hire because she had filed a charge with the E.E.O.C. (*Id.* at 16-17, Pl.'s Dep. 58:16-24, 60:12-17, 61:19-23.) Plaintiff was not hired for a position as either director or secretary. Joseph Rogers was hired as director, and his wife, Gayle Rogers, took the position as his secretary. (*Id.* at 17, Pl.'s Dep. 64:6-13; DE # 19-10, Aff. of Joseph Rogers.)

Though the parties have not pointed to any communication from the E.E.O.C. to plaintiff regarding her charge, the court assumes that the E.E.O.C. issued a "right-to-sue" letter informing plaintiff of her right to file a lawsuit on her own against defendant, because plaintiff did so on May 12, 2010. (DE # 1.) In her complaint, plaintiff alleges violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.,* in the form of sexual harassment, retaliation, and pregnancy discrimination. (*Id.*) After discovery, defendant moved for summary judgment (DE # 19), and the motion is fully briefed and ripe for ruling. Each permutation of plaintiff's Title VII claim will be addressed in turn below.

## II.    LEGAL STANDARD

FEDERAL RULE OF CIVIL PROCEDURE 56 requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). "[S]ummary judgment is appropriate–in fact, is mandated–where there are no disputed issues of material fact and the movant must prevail as a matter of law. In other words, the record must reveal that no reasonable jury could find for the non-moving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.,* 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotation marks omitted).

The moving party bears the initial burden of demonstrating that these requirements have been met. *Carmichael v. Village of Palatine, Ill.,* 605 F.3d 451, 460 (7th Cir. 2010). "[T]he burden on the moving party may be discharged by 'showing'-that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case." *Celotex,* 477 U.S. at 325.

Once the moving party has met his burden, the non-moving party must identify specific facts establishing that there is a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986); *Palmer v. Marion County,* 327 F.3d 588, 595 (7th Cir. 2003) (citing *Celotex,* 477 U.S. at 324). In doing so, the non-moving party cannot rest on the pleadings alone, but must present fresh proof in support of its position. *Anderson,* 477 U.S. at 248; *Donovan v. City of Milwaukee,* 17 F.3d 944, 947 (7th Cir. 1994). The non-

movant must do more than raise some metaphysical doubt as to the material facts; he must come forward with specific facts showing a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). The existence of a mere scintilla of evidence, however, is insufficient to fulfill this requirement. *Carmichael,* 605 F.3d at 460 (citing *Anderson,* 477 U.S. at 251-52). The non-moving party must show that there is evidence upon which a jury reasonably could find for him. *Id.*

The court's role in deciding a summary judgment motion is not to evaluate the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson,* 477 U.S. at 249-50; *Doe v. R.R. Donnelley & Sons Co.,* 42 F.3d 439, 443 (7th Cir. 1994). On summary judgment a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder. *Payne v. Pauley,* 337 F.3d 767, 770 (7th Cir. 2003) (citing *Anderson,* 477 U.S. at 255). In viewing the facts presented on a motion for summary judgment, the court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. *Chmiel v. JC Penney Life Ins. Co.,* 158 F.3d 966, 968 (7th Cir. 1998); *Doe,* 42 F.3d at 443. Importantly, the court is "not required to draw *every* conceivable inference from the record [in favor of the non-movant]-only those inferences that are reasonable." *Bank Leumi Le-Israel, B.M., v. Lee*, 928 F.2d 232, 236 (7th Cir. 1991) (emphasis added).

## III. DISCUSSION

### A. Harassment / "Hostile Work Environment" Claim

Plaintiff alleges that she was subjected to sexual harassment while working for defendant. Sexual harassment is a form of sex discrimination under Title VII. *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 65-66 (1986). Sexual harassment is not limited to *quid pro quo* situations; a sexually hostile or abusive work environment can also constitute sexual harassment in violation of the law. *Id.* When a defendant moves for summary judgment on a hostile environment claim, a plaintiff must show the following to survive the motion: (1) she was subject to unwelcome harassment; (2) the harassment was based on her race or gender; (3) the harassment was severe or pervasive so as to alter the conditions of plaintiff's work environment by creating a hostile or abusive situation; and (4) there is a basis for employer liability. *Williams v. Waste Mgmt. of Ill., Inc.*, 361 F.3d 1021, 1029 (7th Cir. 2004).

The parties primarily dispute the third element of plaintiff's case – whether the alleged harassment was severe or pervasive. For sexual harassment to be actionable, a plaintiff must prove conduct that is so severe or pervasive as " 'to alter the conditions of [her] employment and create an abusive working environment.' " *Meritor,* 477 U.S. at 67 (quoting *Henson v. Dundee,* 682 F.2d 897, 904 (11th Cir. 1982)). In determining whether the harassment rises to this level, the court considers the totality of the circumstances, including the " 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it

unreasonably interferes with an employee's work performance.'" *Gentry v. Export Packaging Co.,* 238 F.3d 842, 850 (7th Cir. 2001) (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23 (1993)). In evaluating the severity of harassment, the court is guided by prior case precedent:

> On one side lie sexual assaults; other physical contact, whether amorous or hostile, for which there is no consent express or implied; uninvited sexual solicitations; intimidating words or acts; obscene language or gestures; pornographic pictures. On the other side lies the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers.

*Baskerville v. Culligan Int'l Co.,* 50 F.3d 428, 430–31 (7th Cir. 1995) (internal citations omitted). The court also assesses the impact of the harassment on the plaintiff's work environment from both a subjective and objective viewpoint; the situation must be "'one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.'" *Gentry,* 238 F.3d at 850 (quoting *Faragher v. City of Boca Raton,* 524 U.S. 775, 787 (1998)). When assessing the severity of a work environment, courts are to avoid parsing out the environment into seemingly benign parts; rather, courts should consider all of the alleged conduct in the aggregate. *Berry v. Delta Airlines, Inc.,* 260 F.3d 803, 811-12 (7th Cir. 2001).

Most of plaintiff's allegations suggest relatively mild conduct on Atlman's part. For example, plaintiff claims that Altman touched her shoulder, touched her clothing and commented on it being silky or soft, stared at her breasts, eyed her up and down, spoke in a "creepy, soft whisper-ish kind of tone," and licked his teeth and lips in a "flirtatious manner." (DE # 19-1 at 7, Pl.'s Dep. 19:14 - 23:14.) Altman would also shut

the door to his office when it was not necessary, or come around behind her desk rather than speaking to her over the counter. (*Id.* at 6-7, Pl.'s Dep. 19:12-13, 21:24-25.) If the court considered this behavior in isolation, it would conclude that it was not objectively so hostile or abusive that it altered the conditions of plaintiff's employment and created an abusive working environment under Title VII. While apparently offensive to plaintiff, the aforementioned behavior by Altman is most appropriately characterized as merely "tinged with sexual innuendo." *Baskerville,* 50 F.3d at 430–31. As the Supreme Court has cautioned, simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment. *Faragher,* 118 S. Ct. at 2283.

However, Altman's occasionally vulgar behavior takes on a more serious tone when considered in conjunction with plaintiff's other allegations. Specifically, plaintiff attested in her deposition that on one occasion Altman sat in a chair "with his legs open" while "moving his hand in a rubbing pattern" (DE # 19-1 at 9, Pl.'s Dep. 29:9-17), and that "[i]t appeared he had an erection," though she could not tell for sure because she was trying to look away (*id.*, Pl.'s Dep. at 29:24, 32:1-3). This behavior seems less like simple teasing and more like the "obscene language or gestures" described as actionable harassment in *Baskerville.* 50 F.3d at 430–31. When all of Altman's conduct is considered in the aggregate, *Berry,* 260 F.3d at 811-12, the court concludes that a reasonable jury could find that Atlman's conduct was so objectively severe or pervasive as to alter the conditions of plaintiff's employment.

Defendant also argues, almost as an aside, that even if the harassment was severe or pervasive, it should not be held liable. "[I]f an employer takes reasonable steps to rectify the reported harassment of its employees," defendant argues, "it has discharged its legal duty under Title VII." (DE # 20 at 10.) Defendant claims that Henricks experienced "no further problems" with Altman after the incident, so defendant must have performed its legal duty to rectify the reported harassment. (*Id.*)

Unfortunately for defendant, the evidence, taken in a light most favorable to plaintiff for purposes of defendant's motion for summary judgment, is that defendant did not take reasonable steps to rectify the harassment. When asked how Weaver responded to plaintiff's complaint regarding the incident in Altman's office, plaintiff attested that Weaver "kind of laughed" and may have said "'okay' or 'uh-huh', something to that effect." (DE # 19-1 at 9, Pl.'s Dep. 32:15-24.) Though plaintiff did not recall whether Weaver ever made things worse by trying to send plaintiff back into Altman's office (*id.* at 10, Pl.'s Dep. 33:3-9), defendant has pointed to no evidence that Weaver ever tried to make things better by escalating the issue to her own superior, speaking to Altman about his behavior, or otherwise taking "reasonable steps to rectify the reported harassment."

What defendant overlooks is the fact that an employer can be liable for harassment even if the harassment fortuitously stops. *Smith v. Sheahan,* 189 F.3d 529, 535 (7th Cir. 1999). In the context of a hostile work environment claim, the question is not whether plaintiff experienced further harassment after complaining, but whether the

employer's response to the complaint fell below the duty of care. *Id.* In this case, after making all reasonable inferences in plaintiff's favor, the evidence at this stage shows that defendant's behavior fell short of the duty of care required of an employer. Accordingly, the court rejects defendant's argument that it is entitled to summary judgment on plaintiff's harassment claim because it performed its legal duty to rectify the reported harassment.

### B.     Retaliation

Under Title VII's anti-retaliation provision, it is unlawful for an employer to "discriminate against" an employee "because he has opposed any practice made an unlawful employment practice" by the statute or "because he has made a charge, testified, assisted, or participated in" a Title VII "investigation, proceeding, or hearing." 42 U.S.C. § 2000e-3(a). Like a discrimination claim, a retaliation claim can be established through either the direct or indirect method. *Jajeh v. County of Cook,* 678 F.3d 560, 569 (7th Cir. 2012). To satisfy the direct method of proof, plaintiff must show that: (1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment action at the hands of the defendant; and (3) there was a causal link between the protected activity and the adverse employment action. *Id.*

If plaintiff is unable to satisfy the direct method of proof, she may also proceed under the indirect method of proof, which utilizes the familiar burden-shifting method of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). Under the indirect method of proof, a plaintiff must first establish a *prima facie* case of retaliation. This is typically

accomplished by showing that: (1) after lodging a complaint about discrimination, (2) only she, and not any otherwise similarly situated employee who did not complain, was (3) subjected to an adverse employment action, even though (4) she was performing her job in a satisfactory manner. *Whittaker v. N. Ill. Univ.,* 424 F.3d 640, 647 (7th Cir. 2005). Thereafter, the burden is placed on defendant to provide a legitimate, non-discriminatory reason for the challenged action. *Id.* If defendant does so, the burden returns to plaintiff to establish that those proffered reasons were pretextual. *Id.*

Importantly, both the direct and indirect methods of proving a retaliation claim require plaintiff to demonstrate an adverse employment action. *See Jajeh,* 678 F.3d at 569 (articulating adverse employment action as element of plaintiff's retaliation claim under direct method of proof); *Whittaker,* 424 F.3d at 647 (same, indirect method of proof). Adverse employment actions in the retaliation context are "not limited to discriminatory actions that affect the terms and conditions of employment." *Burlington N. and Santa Fe Ry. Co. v. White,* 548 U.S. 53, 64 (2006). However, a plaintiff must show that the alleged retaliatory action was "materially adverse," meaning that it might well have dissuaded a reasonable worker from engaging in a protected activity. *See id.* at 68. At the least, "an employee must be able to show a quantitative or qualitative change in the terms or conditions of employment" in order to establish an adverse employment action in the retaliation context. *Herron v. DaimlerChrysler Corp.,* 388 F.3d 293, 301 (7th Cir. 2004).

In this case, plaintiff contends that she was retaliated against in the following ways: (1) defendant disciplined her on two occasions; (2) Weaver and Harl ignored her, sometimes for days; (3) defendant "availed itself of the opportunity to separate Henricks" from the employment relationship; and (4) defendant refused to consider Henricks for a secretarial position in late 2009. (DE # 24 at 15.) The first two of these contentions can be easily dealt with. The Seventh Circuit considers it "well-established" that negative performance evaluations do not constitute an adverse employment action in the retaliation context. *Haywood v. Lucent Techs., Inc.,* 323 F.3d 524, 532 (7th Cir. 2003). Nor can an employee be said to have suffered an adverse employment action for purposes of a retaliation claim when her fellow workers give her "dirty look[s]" or "the silent treatment," *Sweeney v. West,* 149 F.3d 550, 556 (7th Cir. 1998), or otherwise ostracize her, *Parkins v. Civil Constrs. of Ill., Inc.,* 163 F.3d 1027, 1039 (7th Cir. 1998). In short, the first two of plaintiff's four retaliation allegations fail because she cannot satisfy the "adverse employment action" element of her claim, which is necessary under either the direct or indirect method.

Plaintiff's third argument that she experienced retaliation is that defendant "availed itself of the opportunity to separate Henricks" in September of 2008 because she complained about Altman's harassment. (DE # 24 at 15.) Perhaps plaintiff phrases it this way to avoid characterizing plaintiff as having purposefully resigned, but the situation is the same no matter how it is worded. Plaintiff told Weaver to accept her resignation, unless she addressed her concerns, which boiled down to office decorum

and her complaints regarding Altman's alleged sexual harassment. (DE # 19-7.) Plaintiff essentially complains that she was forced to resign, or constructively discharged, from her employment.

Constructive discharge, under the right circumstances, can suffice as an adverse employment action for purposes of a retaliation claim. Constructive discharge occurs when an employee's job becomes so unbearable due to retaliation that a reasonable person in that employee's position would be forced to quit. *Williams v. Waste Mgmt. of Ill.,* 361 F.3d 1021, 1032 (7th Cir. 2004). This standard sets a "high bar." *Boumehdi v. Pastag Holdings, LLC,* 489 F.3d 781, 789 (7th Cir. 2007). The circumstances must be such that a reasonable person put in the same situation would find it to be intolerable. *Williams,* 361 F.3d at 1032. Mere unhappiness and annoyances will not suffice; the allegedly retaliatory behavior must create a "quantitative or qualitative change in the terms or conditions of employment" in order to establish an adverse employment action in the retaliation context. *Herron,* 388 F.3d at 301. A plaintiff arguing constructive discharge must demonstrate that her employer's actions or failures resulted in a discriminatory work environment even more egregious than the high standard for a hostile work environment claim. *Fischer v. Avanade, Inc.,* 519 F.3d 393, 409 (7th Cir. 2008).

Plaintiff argues that her working conditions were intolerable after she complained about Altman's harassment in the following ways: (1) Weaver used "harsh words" with her; (2) Weaver slammed doors around her; (3) Weaver would not speak

to her for days; (4) Weaver made false allegations of misconduct against her, including conduct that had never bothered Weaver in the past; and (5) Weaver ignored plaintiff's complaint[1] about Altman's harassment. (DE # 24 at 19.)

The Seventh Circuit has generally reserved the label of "constructive discharge" for situations involving egregious emotional torment and threats of physical harm. *See, e.g., Taylor v. W. & S. Life Ins. Co.,* 966 F.2d 1188, 1191 (7th Cir. 1992) (finding constructive discharge where the employee's boss consistently made racial comments and on one occasion held a gun to his head, took a photo, and later showed it at a staff meeting while joking that "this is what a n[*****] looks like with a gun to his head"); *Brooms v. Regal Tube Co.,* 881 F.2d 412, 417, 423 (7th Cir. 1989), *rev'd in part on other grounds, Saxton v. Am. Tel & Tel. Co.,* 10 F.3d 526 (7th Cir. 1993) (plaintiff established constructive discharge where "repeated instances of grossly offensive conduct and commentary" culminated with an incident during which a co-worker showed the plaintiff a racist pornographic photograph, told her that she was hired to perform the task depicted in the photograph, grabbed the plaintiff, and threatened to kill her). Clearly, the treatment plaintiff received did not rise to this level.

While *Taylor* and *Brooms* may seem like obvious examples of constructive discharge, the Seventh Circuit has held that other seemingly disturbing conduct did *not*

---

[1] The court limits its discussion to the complaint made by plaintiff to Weaver about her interaction with Altman in his office on July 22, 2008. As explained above, until that point, none of Altman's conduct constituted actionable harassment requiring a response from Weaver.

rise to the very high level required to establish constructive discharge. *See, e.g., Simpson v. Borg-Warner Auto., Inc.,* 196 F.3d 873, 877-78 (7th Cir. 1999) (co-worker's comment that "someone should take a dish and knock [the plaintiff] upside the head" did not establish constructive discharge); *Dunn v. Washington County Hosp.,* 429 F.3d 689, 693 (7th Cir. 2005) (no constructive discharge where doctor pushed nurse against cabinet and, while he had her pinned, tapper her on the cheek with a closed fist to urge nurse to withdraw sexual harassment complaint).

If these examples did not even meet the Seventh Circuit's standard for establishing constructive discharge, plaintiff's complaints of slammed doors and the silent treatment hardly suffice. Nor can plaintiff rely on her claim that she was unfairly and falsely presented with disciplinary actions. *Simpson,* 196 F.3d at 878 (false or arbitrary reprimands are unpleasant, but not intolerable); *Harriston v. Chi. Trib. Co.,* 992 F.2d 697, 705 (7th Cir. 1993) (being reprimanded without reason was not intolerable enough to support argument for constructive discharge).

The fact that Weaver did nothing in response to plaintiff's complaint of harassment by Altman is concerning. The court could imagine a situation where a manager's failure to address harassment complaints could tacitly encourage further harassment, thus creating a situation so extreme and odious that the manager's failure to address the issue would constitute a constructive discharge. If, after plaintiff's complaint, Weaver had continued to send plaintiff into Altman's office, silently encouraging additional opportunities for harassment and therefore causing plaintiff's

working environment to continue to be unpleasant in terms of harassment, then perhaps the situation would give the court pause. But that is not what happened. In this case, plaintiff asked never to have contact with Altman again, and she admits that she got what she wanted. (DE # 19-1 at 10, Pl.'s Dep. 33:1-12.) Weaver may not have been responsible for the respite in harassment, but for purposes of plaintiff's constructive discharge argument, plaintiff must show that Weaver's failure to address her complaint allowed plaintiff's exposure to harassment to continue or somehow made things worse. This is something the evidence does not show.

In other words, plaintiff has not demonstrated that Weaver's failure to address her complaints of sexual harassment had any negative effect on plaintiff's work environment, much less created an unbearable environment, even more severe than is typically required to establish a hostile work environment claim. Because Weaver's alleged failure to address plaintiff's harassment complaint did not create a "quantitative or qualitative change in the terms or conditions of employment," *Herron,* 388 F.3d at 301, such that a reasonable person in plaintiff's position would feel "forced to quit," *Williams,* 361 F.3d at 1032, the court cannot find that plaintiff was constructively discharged when Weaver failed to respond to plaintiff's complaint of harassment.[2]

---

[2] This is not to say that Weaver's lack of response to plaintiff's complaints of harassment was appropriate. Weaver's lack of response still could have significant legal consequences for defendant's organization in other ways. However, for purposes of plaintiff's retaliation claim to the extent that it is premised on a theory of constructive discharge, the court cannot conclude that Weaver's failure to address plaintiff's complaints created an unbearable working environment.

Plaintiff's fourth and final argument that she experienced retaliation is that defendant refused to re-hire her as a secretary[3] following her resignation because she had filed a formal complaint with the E.E.O.C.[4] Plaintiff seeks to survive summary judgment on this issue through the indirect method of proof. As explained above, this method of proof first requires the plaintiff to establish a *prima facie* case; if she does so, then defendant must articulate a legitimate, non-discriminatory reason for its action. If defendant meets its burden, then the burden returns to plaintiff to demonstrate that the defendant's proffered reason is pretextual. At this point the direct and indirect methods merge, and any inference of discrimination that arises from the burden-shifting framework is simply a part of the circumstantial evidence to be considered on the ultimate issue. *Huff v. UARCO Inc.,* 122 F.3d 374, 380 (7th Cir. 1997).

In a failure-to-hire situation, the *prima facie* case which much be established by the plaintiff in the first phase of the indirect method of proof is modified slightly from the normal formulation. In order to survive the *prima facie* stage, the unhired plaintiff must demonstrate that: (1) she engaged in a statutorily protected activity; (2) she applied and had the qualifications required for the position; 3) she was not hired for the

---

[3] Plaintiff originally complained that defendant also failed to hire her as director of the Area Plan, but in her response brief, she abandons that contention and now relies only on her argument that defendant failed to hire her as a secretary. (DE # 24 at 20 n.1.)

[4] Unlike the other alleged retaliatory acts, defendant's failure to re-hire plaintiff is alleged to have sprung from plaintiff's filing of a formal E.E.O.C. charge. Plaintiff argues that all of the other retaliatory acts (disciplinary actions, rude conduct, the "silent treatment," and defendant's acceptance of her resignation) were leveled upon plaintiff in retaliation for her complaint to Weaver about Altman's sexual harassment.

position; and 4) a similarly situated individual who did not engage in the protected activity was hired for the position. *Cichon v. Exelon Gen. Co., L.L.C.,* 401 F.3d 803, 812 (7th Cir. 2005).

Defendant only disputes plaintiff's ability to satisfy the second element of her *prima facie* case, arguing somewhat in passing that plaintiff was not qualified for the position. (DE # 20 at 14.) Defendant does not dispute that plaintiff possessed the technical qualifications for the job, but points out that plaintiff was the subject of at least two disciplinary actions in the last few months of her employment. (DE # 20 at 13, 15.) However, the legitimacy of and motivation behind these disciplinary actions is hotly contested, and the plaintiff gets the benefit of all reasonable inferences at this stage. *Chmiel,* 158 F.3d at 968. Accordingly, the court finds that plaintiff can establish a *prima facie* of retaliation in connection with her claim that defendant failed to re-hire her.

The next step in the process requires defendant to articulate a legitimate, non-discriminatory reason for the challenged action. *Whittaker,* 424 F.3d at 647. Defendant easily satisfies its relatively light burden in this respect by pointing out that Joseph Rogers, who was selected for the position of Area Plan Director and for whom the new secretary would be working, wanted to hire his wife, Gayle Rogers, as his secretary. (DE # 25 at 8.) Defendant has also submitted the affidavit of Joseph Rogers, in which Rogers attests that he selected Gayle Rogers to be his secretary without any knowledge that plaintiff had a pending E.E.O.C. charge against the County. (DE # 19-9.) Because defendant has satisfied its burden to articulate a legitimate non-discriminatory reason

for its decision, the burden now returns to plaintiff to establish that the proffered reason is pretextual. *Whittaker,* 424 F.3d at 647.

Plaintiff attempts to meet her burden by arguing that the Board of the Area Plan Commission acted to ensure that Henricks would not be considered for the secretarial position because she had filed a charge with the E.E.O.C. In support of this argument, plaintiff points to her deposition testimony, in which she attested that Gerald Cartmell, an Area Plan Board member, admitted to plaintiff over the phone that she would not be rehired because of her E.E.O.C. complaint. (DE # 19-1 at 16-18, Pl.'s Dep. 58:16 - 60:17.)

However, in order to suggest that Rogers' choice of his own wife for the position was pretextual, plaintiff needs to point to evidence suggesting that Cartmell or the Area Plan Board on which he served had some say in who the director hired as his secretarial assistant. Plaintiff's best attempt to show that the Area Plan Board of Commissioners held approval power over Area Plan secretarial hires is a memo related to her own hiring in 2007; in the memo, addressed to the White County Commissioners, the author (presumably Weaver) states that the Area Plan would like to hire plaintiff for a secretarial position beginning Monday April 9, 2007. (DE # 24-3.) Importantly, however, this memo was addressed to the *White County* Commissioners. At most, this memo suggests that the *White County* Commissioners might have some approval power over Area Plan secretarial appointments. But Cartmell did not serve on the White County Board of Commissioners, he served on a separate entity: the *Area Plan* Board of Commissioners.

In other words, there is no evidence in the record that the Area Plan Board of Commissioners, on which Cartmell served, had any say in Rogers' decision to hire his wife as his secretary. Accordingly, plaintiff's attempt to prove pretext and the ultimate issue of whether defendant retaliated against plaintiff for filing her E.E.O.C. charge by refusing to re-hire her for a secretarial position fails. Defendant is entitled to summary judgment on plaintiff's retaliation claim.

## C.     Pregnancy Discrimination

Plaintiff's third and final Title VII claim is that defendant discriminated against her on the basis of her pregnancy in violation of the PDA. The PDA "made clear that, for all Title VII purposes, discrimination based on a woman's pregnancy is, on its face, discrimination because of her sex." Thus, plaintiff's claim for pregnancy discrimination is a claim for gender discrimination, and the legal analysis for both claims is the same. *Serednyj v. Beverly Healthcare, LLC,* 656 F.3d 540, 547 (7th Cir. 2011).

Like a retaliation claim, a gender discrimination claim can be proven via either the direct or indirect method of proof. In this case, plaintiff appears to rely on the indirect method of proof. The indirect method requires a plaintiff to first establish a *prima facie* case of discrimination. *Serednyj,* 656 F.3d 540, 550-51. In order to do so, plaintiff must show that: (1) she was pregnant and her employer knew she was pregnant; (2) she was performing her duties satisfactorily; (3) she suffered an adverse employment action; and (4) similarly situated non-pregnant employees were treated more favorably. *Silverman v. Bd. of Educ. of City of Chi.,* 637 F.3d 729, 736 (7th Cir. 2011).

Thereafter, the burden is placed on defendant to provide a legitimate, non-discriminatory reason for the challenged action. *Id.* If defendant does so, the burden returns to plaintiff to establish that those proffered reasons were pretextual. *Id.*

Defendant argues that plaintiff cannot establish the third element of her *prima facie* case: that she suffered an adverse employment action. (DE # 20 at 11.) Plaintiff retorts that she was terminated or constructively discharged. (DE # 24 at 32.) The evidence does not support even a reasonable inference that plaintiff was terminated (*see* plaintiff's resignation letter at DE # 19-6), so the court proceeds only with regard to plaintiff's argument that she was constructively discharged. Rather than re-hash her constructive discharge argument in the pregnancy discrimination section of her brief, plaintiff simply refers the court to the "retaliation" section of her brief, in which she argued that she was constructively discharged. (DE # 24 at 23.) The court has already rejected plaintiff's constructive discharge argument in the retaliation context, and for the reasons set forth below, it does the same in the pregnancy discrimination context.

As the court has explained in detail above, constructive discharge occurs when an employee's job becomes so unbearable that a reasonable person in that employee's position would be forced to quit. *Roby v. CWI, Inc.,* 579 F.3d 779, 785 (7th Cir. 2009). The standard for establishing constructive discharge is extremely high; the situation must be "even more egregious than that needed for a hostile work environment" claim. *Overly v. KeyBank Nat'l Ass'n,* 662 F.3d 856, 864 (7th Cir. 2011). Further, the working conditions that caused the constructive discharge must be intolerable in a discriminatory way. No

matter how "horrific the conditions," plaintiff must put forth evidence showing that the conditions were inflicted upon her because of her pregnancy. *Vitug v. Multistate Tax Comm'n,* 88 F.3d 506, 517 (7th Cir. 1996).

As the court has also explained above, plaintiff's allegations that Weaver (and perhaps also Harl) spoke harshly to her, ignored her, slammed doors, and provided her with false and unfair disciplinary reviews do not establish a working environment so intolerable that a reasonable person would feel compelled to resign. *See, e.g., Simpson,* 196 F.3d at 878. Plaintiff's only remaining argument for a finding of constructive discharge is the fact that Weaver ignored her complaints regarding Altman's harassment. However, as explained above in the context of plaintiff's retaliation claim, plaintiff would have to demonstrate that Weaver's failure to address plaintiff's complaints regarding Altman *created* an intolerable working environment, one meeting an even higher standard than that required to establish a hostile work environment claim. *Overly,* 662 F.3d at 864. By plaintiff's own admission, after she complained to Weaver about the incident in Altman's office, she was never bothered by Altman again. (DE # 19-1 at 10, Pl.'s Dep. 33:1-12.) Whether this was a consequence of her complaint or simply sheer coincidence, it cannot be disputed that her workplace environment included no sexual harassment after her complaint to Weaver about Altman. Thus, plaintiff has pointed to no evidence suggesting that Weaver's failure to address her harassment complaint *created* an intolerable environment.

Further, to succeed with this argument, plaintiff would have to demonstrate that Weaver ignored her harassment complaint *because plaintiff was pregnant. Vitug,* 88 F.3d at 517. This would be somewhat difficult for plaintiff to do, as plaintiff's complaint to Weaver about Altman and Weaver's alleged dismissive remarks took place three days before plaintiff told Weaver she was pregnant. But in any event, no connection between plaintiff's pregnancy and Weaver's lack of response to plaintiff's sexual harassment complaint has been shown, nor are there any facts from which such a connection could be reasonably inferred.

Because plaintiff cannot demonstrate that she was constructively discharged, she cannot establish the "adverse employment action" element of a *prima facie* claim of pregnancy discrimination. Accordingly, plaintiff fails to establish an issue of fact regarding pregnancy discrimination via the indirect method (or any method) of proof, and defendant is entitled to summary judgment on that claim.

## IV.    CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment (DE # 19) is **GRANTED, in part, and DENIED, in part.** Plaintiff's motion for an extension of time to file a response (DE # 23) is **GRANTED**. For clarity's sake, the only remaining claim in this case is by plaintiff against defendant for sexual harassment. Discovery has closed and the dispositive motion deadline has passed; accordingly, the court will set this case for trial under separate order.

**SO ORDERED.**

Date: November 28, 2012

s/James T. Moody _____
JUDGE JAMES T. MOODY
UNITED STATES DISTRICT COURT